Date signed July 23, 2008

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF MARYLAND
at GREENBELT

| | |
|---|---|
| In Re: | * |
| Mortgage Banking Trust, | * |
| | * |
| Debtor-In-Possession. | * |

*************************************************************************

**MEMORANDUM OF DECISION**

      Before the Court is the Motion to Dismiss Pursuant to 11 U.S.C. §1112 (the "Motion") filed by Caroline K. Nash ("Caroline Nash"), Co-Trustee of the Nash Marital Trust (the "Movant"). The Movant seeks an order dismissing the Chapter 11 filing by the debtor Mortgage Banking Trust (the "MBT"), alleging that (1) as a trust, the MBT is not eligible to file for bankruptcy relief; and (2) MBT filed the petition in bad faith. The MBT opposes the Motion. The Court bifurcated the issues raised in the Motion to address first the question of whether the MBT is eligible to file for bankruptcy relief, and held evidentiary hearings on this issue on July 7 and 14, 2008. For the reasons stated herein, the Court finds and concludes that the MBT is not a business trust, and is not eligible to file for bankruptcy relief. Accordingly, the Court will dismiss the bankruptcy case.

      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334, 28 U.S.C. §157(a), and Local Rule 402 of the United States District Court for the District of Maryland. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O).

1

I. FACTS

  A. The Mortgage Banking Trust Agreement

Thomas K. Nash ("Thomas Nash") created the MBT by entering into the Mortgage Banking Trust Agreement (the "MBT Agreement") on July 21, 1994. Thomas Nash was the grantor of the MBT, and named himself as trustee. The Recitals of the MBT Agreement provide:

> The Grantor desires to establish a revocable trust to hold certain property, and to provide for the maintenance, care, comfort and support of the Grantor and the Grantor's beneficiaries, as herein provided, to be known as the Mortgage Banking Trust.

MBT Agreement at 1. As a revocable trust, the MBT Agreement reserved to Thomas Nash broad powers to revoke, modify or amend the MBT Agreement, and to withdraw any property from the trust estate or to remove any trustee. Id. at Article Twelfth. The MBT Agreement provides that the MBT shall pay to Thomas Nash "such amounts of net income of the trust estate as requested" by Thomas Nash. Id. at Article Second. If Thomas Nash were to become disabled, the trustee "shall distribute such amounts of income as are necessary for the health, maintenance and support" of Thomas Nash. Id. Thomas Nash could direct the trustee to pay to him such amounts of principal as he directed in writing. Id. at Article Third.

Upon the death of Thomas Nash, the trustee is required to "pay promptly" from the trust estate all income, estate and inheritance taxes, and any debts, claims or expenses that, in the judgment of the trustee, are properly payable and chargeable against either Thomas Nash's estate or the trust estate. Id. at Article Fourth. Thereafter, the remainder of the trust estate is to be distributed to "the then serving Trustees of the Thomas K. Nash Family Trust, established under agreement on March 16, 1999" or if no such trust is then

2

in existence, to the estate of Thomas K. Nash to be distributed in accordance with his will. First Amendment to MBT Agreement at 1-2.[1]

The MBT Agreement contains provisions for delaying any distributions due to minors or incapacitated beneficiaries. MBT Agreement at Articles Seventh and Ninth. In the case of a minor, the trustee is directed to pay to or for the benefit of the minor such amounts from the minor's share as are desirable for the health, education, support and maintenance of the minor. Id. at Article Seventh. The MBT Agreement further provides that the "interest of any beneficiary other than the Grantor shall not be subject to the claims of any creditor or liable to attachment, execution, or other process of law, and may not be voluntarily or involuntarily alienated or encumbered." Id. at Article Tenth.

Article Sixteenth sets forth broad powers and authority of the trustee to administer and manage the MBT.

### B. Thomas Nash's Estate and Marital Planning

Thomas Nash created the MBT in part for estate planning and in part for marital planning. This fact was admitted even by Alan W. Nash ("Alan Nash"), the current trustee of the MBT, who opposes the Motion. The MBT was part of Thomas Nash's estate planning because the beneficiaries of the MBT are the beneficiaries he directs through his will or the Thomas K. Nash Family Trust, which he created as described below. It was part of his marital planning because Thomas Nash created the MBT upon his divorce from his first wife and just prior to his marriage to Caroline Nash, and he wanted to be sure that the assets in the MBT would not be considered marital assets.

---

[1] Originally, Article Fifth of the MBT Agreement provided that after Thomas Nash's death, the entire balance of the trust estate was to be distributed to the estate of Thomas K. Nash to be distributed in accordance with his will. Article Fifth was amended on August 24, 2000, to be as described in the text.

3

In 1994, Thomas Nash was concluding a bitter divorce from Martha Nash, which had been proceeding for five years since their separation in 1989. He began dating Caroline Nash in 1990, and he was planning to marry her when he created the MBT. They married in December, 1994. At the time of his divorce and remarriage, Thomas Nash had three daughters with Martha Nash.

In light of these events, and as part of his estate and marital planning, Thomas Nash entered into a series of agreements within a short timeframe in 1994, including: (1) a Property Settlement Agreement between Thomas Nash and Martha Nash dated May 23, 1994; (2) the MBT Agreement dated July 21, 1994; and (3) a prenuptial agreement between Thomas Nash and Caroline Nash dated August 4, 1994.

In addition, Thomas Nash also created the Thomas K. Nash Family Trust, the Nash Marital Trust, a separate Investment Trust for each of his three daughters and a separate Insurance Trust for each of his three daughters. The exact date of the creation of these eight other trusts is not clear in the record. The testimony established, however, and the Court finds that these other trusts—in particular, the Thomas K. Nash Family Trust, the Nash Marital Trust and the separate Investment Trust for each of his three daughters—were clearly part of Thomas Nash's estate and marital planning, and that the MBT was an important element in that planning.

### C. Thomas Nash's Injury and Death

Thomas Nash suffered a serious polo accident on September 30, 2000. He never recovered and died on April 6, 2002. Pursuant to the terms of the MBT Agreement, Alan Nash became the successor trustee and assumed control of the MBT immediately upon

Thomas Nash's injury. Thomas Nash and Alan Nash were cousins and had enjoyed a close personal relationship since they were young.

Until Thomas Nash's death, the MBT was a revocable trust and its income and expenses flowed through the MBT to the personal tax return of Thomas Nash. See e.g., Debtor's Ex. A at 4. Thomas Nash was the MBT's sole beneficiary. Id. Upon his death, the MBT became irrevocable. At that point, the purpose of the MBT was to pay taxes and expenses of the MBT or the Estate of Thomas Nash and distribute the assets in accordance with the terms of the MBT Agreement. The only reason assets still remain in the MBT so long after Thomas Nash's death is because of the alleged disputes by Alan Nash over the funding of an annuity distribution to Martha Nash and the amount of the distribution to the Movant for the benefit of Caroline Nash.

### D. The Investments and Operations of the MBT

At the time of Thomas Nash's injury, the assets of the MBT consisted primarily of (1) various deed of trust notes evidencing real estate loans that Thomas Nash had made from the MBT when he was the trustee; (2) real estate, consisting primarily of the Nash family farm and various other real estate investments; and (3) the MBT's interest in the Capital City Mortgage Corporation ("CCMC"), which was Thomas Nash's business.

As stated above, since Thomas Nash's injury, the MBT has been administered by Alan Nash, the successor trustee. Alan Nash has not acquired any additional assets in the MBT (other than swapping a portion of the Nash family farm owned by the MBT for another portion of the Nash farm owned by Thomas Nash's sister), and testified that it is in a "winding down" function. In the past, the MBT owned deed of trust notes as investments. See Debtor's Ex. M at 6-7. All of those notes had long since been

collected, foreclosed upon or otherwise resolved as of the hearing on the Motion, and the MBT no longer holds any notes for investment.  <u>See</u> <u>e.g</u>, Debtor's Ex. P (Balance sheet dated December 31, 2007).  Indeed, it appears from the documentary evidence that all of the notes, except the note to "Jerome," had been reduced to a zero or nominal balance as early as December 31, 2000, well before Thomas Nash's death.  <u>See</u> Debtor's Ex. H at 4 (December 31, 2000 balance sheet reflecting only note receivable of significance is for "Jerome"); Debtor's Ex. I at 1 (same for December 31, 2001); Debtor's Ex. J at 4 (same for December 31, 2002).  <u>See</u> also Debtor's Ex. M at 6-7 (Ledger account dated entries for notes from Jerome, Peterson, Cleo Belmar; Akhigbe, Ridley, Afrah and Kostovski, reflecting little, if any, activity from January, 2000 through December 31, 2004).  In any event, the record is clear that the deed of trust note investments have not constituted significant assets of the MBT for the six years since Thomas Nash's death.

      Similarly, the MBT held a number of parcels of real estate as investments in the past.  The balance sheet dated December 31, 2007, however, reflects that the MBT holds only three such parcels on that date.  The most significant asset is a portion of the Nash family farm.  At the time Thomas Nash created the MBT, he owned Locust Grove, a portion of the Nash family farm, and transferred it to the MBT.  He and Caroline Nash lived on Locust Grove during their marriage.  Locus Grove had a large barn whose second floor was used by Caroline Nash and her law partner for their practice.  They paid rent for this use.

      Other Nash family members owned and lived on other portions of the Nash family farm.  In the past few years, Alan Nash, as trustee of the MBT, swapped Locust Grove for Bon Secours, the portion of the Nash family farm owned by Thomas Nash's

sister. Caroline Nash attempted to stop Alan Nash from making the swap, by calling him and having her attorney write a letter, but he did not respond and the swap occurred. Currently, Bon Secours is the most significant asset in the MBT.

Alan Nash testified that he operates the MBT "as a business" and in a "business-like fashion." By that he means that he makes decisions in a business-like manner, he relies on legal and accounting professional help, and he has detailed, albeit informal, accounting statements prepared. He also collects rents from some of the real estate investments and maintains and repairs them. To the extent any notes were outstanding when he assumed administration of the MBT, he collected or resolved them. He has sold some of the real estate investments over the years. He is developing one of the parcels of real estate.

The MBT is a participant in the Asset Management Account ("AMA"), along with other entities or trusts established by Thomas Nash. Those entities or trusts include Apple LLC, Balsam LLC, Cypress LLC, Dogwood LLC, the Profit Sharing Trust, the Ann E. Nash Investment Trust, the Carolyn D. Nash Investment Trust, the Katherine R. Nash Investment Trust and CCMC. The AMA is a cash management system designed by the accountant for Thomas Nash and these entities. In a nutshell, all of these entities deposit most, if not all, of their receipts to a centralized account, and most, if not all, of their disbursements are made from the account. Detailed accounting records are maintained that are designed to track for each entity its receipts and disbursements. The AMA uses a "due to/due from" system to keep track of disbursement made on behalf of an entity that does not have a positive balance in the account at the time a disbursement is made on its behalf. A "due to" is established from the benefitting entity, and a "due

from" is established for the entity who carries a positive balance at the time of the disbursement (and so whose funds are used to make the disbursement). The MBT carries a substantial "due to" balance—which it shows as a negative contra asset account—on its balance sheet, evidencing its use of substantially greater funds from the AMA than it deposited into the account. This "due to" balance has increased substantially during Alan Nash's tenure as trustee. MBT's "due to" increased from $405,815 on December 31, 2002 (Debtor's Ex. J at 4), to $1,173,776 on December 31, 2004 (Debtor's Ex. N at 1), to $2,590,004 on December 31, 2007 (Debtor's Ex. P at 1). See also, Debtor's Ex. M at 7-19 (listing the individual ledger entries that constitute the increase in the MBT "due to" account from January 5, 2000 to December 31, 2004).

### E. The State Court Litigation

Apparently, the Nash Family Trust (or Thomas Nash's will) contained a directive to make a distribution to the Movant (of which Caroline Nash is the beneficiary) which was ambiguous to Alan Nash, and so he failed to make the distribution. Caroline Nash, on behalf of the Movant, brought suit in the Circuit Court for Montgomery County, Maryland. On October 28, 2005, the Montgomery County Circuit Court ruled in favor of Caroline Nash, finding that the Nash Marital Trust was entitled to a disbursement from the MBT, but did not resolve the issue of the amount to which it was entitled. See Order for Judgment, Movant's Ex. 4.

Alan Nash still did not fund the disbursement to the Movant, and thus Caroline Nash filed a second lawsuit on behalf of the Movant in the Montgomery County Circuit Court on December 21, 2006. See Complaint for Declaratory Relief, Movant's Ex. 5. There she sought a judgment declaring the amount to which she was entitled and an order

directing the disbursement to be made. On June 13, 2008, only a few days before the lawsuit was scheduled for trial, Alan Nash caused the MBT to file a Chapter 11 bankruptcy petition. As a result, the lawsuit was stayed.

## II.     CONCLUSIONS OF LAW

Section 109(d) of the United States Bankruptcy Code provides that "[o]nly a . . . person that may be a debtor under chapter 7 of this title . . . may be a debtor under chapter 11 . . ." 11 U.S.C. §109(d). The term "person" includes "individual, partnership, and corporation." 11 U.S.C. §101(41). The term "corporation" includes a "business trust." 11 U.S.C. §101(9)(A)(v). Thus, the law is clear that a business trust is eligible under Section 109(d) to file a Chapter 11 bankruptcy petition, but that a personal, family or testamentary trust—the primary purpose of which is to provide for the maintenance of the trust beneficiaries—is not eligible. In re Hurst Trust, No. 97-14562-PM, 1997 Bankr. LEXIS 997, at *9 (Bankr. D. Md. June 19, 1997). Accordingly, the Court must determine whether the MBT is a business trust as that term is used in Section 101(9)(A)(v).

A number of cases have addressed the issue of what constitutes a business trust under Section 101(9)(A)(v). No uniform standard has emerged. The Fourth Circuit Court of Appeals has not addressed the issue, but two circuit courts of appeal have, as have a number of bankruptcy courts within the Fourth Circuit.

The Second Circuit in In re Secured Equipment Trust of Eastern Airlines, Inc., 38 F.3d 86, 89 (2d Cir. 1994) determined that a court must analyze several factors to find whether a trust is a business trust, with the first factor being whether the trust has attributes of a corporation. Next, a court must determine whether the trust was created

"for the purpose of carrying on some kind of business," or whether the purpose was "to protect and preserve the res." Id. Then a court must consider whether the trust engages in business-like activities, although while a trust "must engage in business-like activities to qualify as a business trust, such activity, without more, does not necessarily demonstrate that a trust is a business trust." Id. Finally, the court must consider whether the trust provides benefits to the beneficiaries, which are not limited to profits. Id. at 90. However, the "presence or absence of a profit motive [is] influential" in determining the existence of a business trust. Id. at 90.

Ultimately, Secured Equipment held that there is no definitive list of characteristics, and that eventually, "each decision is based on a very fact-specific analysis of the trust at issue." Secured Equipment at 89, see also In re Happy Trust Three, 122 Fed. Appx. 527, 528 (2d Cir. 2004) (court found that the trust never engaged in business activities, never turned a profit, did not presently and was unlikely to engage in business activities in the future, and was thus not a business trust). Furthermore, even though the Secured Equipment trust qualified as a business trust under New York corporate law because it was an association that operated a business under a written instrument, and the beneficial interests were divided into shares, the Court held that its focus must be on the trust documents and the totality of the circumstances, and not solely on whether a trust engages in business activities. Secured Equipment at 91.

The Sixth Circuit developed the "primary purpose" test to determine whether a trust is a business trust. The test consists of two propositions:

> First, "trusts created with the primary purpose of transacting business or carrying on commercial activity for the benefit of investors qualify as business trusts, while trusts designed merely to preserve the trust res for beneficiaries generally are not business trusts," and second, "the

10

>determination is fact-specific, and it is imperative that bankruptcy courts make thorough and specific findings of fact to support their conclusions"—findings, that is, regarding what was the intention of the parties, and how the trust operated.

In re Kenneth Allen Knight Trust, 303 F.3d 671, 680 (6th Cir. 2002)(internal citations omitted).

The Court in Knight Trust found that grantor cum trustee treated the trust as he did all the other business entities. Id. at 674-75. The Court found that the primary purpose of the trust was to transact business for the benefit of the grantor—the investor, and not merely to preserve the trust res for the beneficiaries. Id. In formulating the primary purpose test, the Court held that neither transferable certificates of ownership, nor the trust's business activity being for profit are necessary requirements in determining whether a trust is a business trust. Knight Trust at 676-77.

The definitive District of Maryland case is In re Hurst Trust, in which a trust was created by the last will and testament of Nellie M. Hurst. The will stated that it was the grantor's desire to have her property held for the benefit of her children and grandchildren forever. The will named two trustees who were to "hold, manage, invest and reinvest and to pay over or apply the net rents, profits, dividends and income . . . at their discretion . . ." for her issue's benefit. In re Hurst Trust at *2-3. The trust property contained shares of a restaurant. The trust was to terminate when the eldest grandchild reached the age of twenty-one. In determining whether the Hurst trust was a business trust, the Court reviewed the business trust section of Am. Jur. 2d., which states that a business trust is created voluntarily by the parties, that the trust property is titled in the trustees, the beneficial interests are evidenced by transferable documents, and the existence of the trust is not affected by the death or disability of a member. According to

11

that treatise, the most significant element in establishing a business trust is the profit-making function of the trust.  13 Am. Jur. 2d. Business Trusts §3 (1964).  The Hurst Court also relied in part on the case of In re Morgantown Trust No. 1, 155 B.R. 137 (Bankr. N.D. W. Va. 1993), in which the court there found that a business trust is founded by a voluntary pooling of capital by a number of people who are the holders of transferable certificates.

The Hurst Court determined that the trust was a testamentary trust because there was no pooling of capital by the beneficiaries, no transferable shares—in fact there was an anti-alienation clause that forbid any beneficiary from alienating principal or income—and because the trust terminated and distributed all assets once the last grandchild reached twenty-one.  In re Hurst Trust at *9-10.  The Court went on to find that the mere ownership of an interest in a presently operating business could not compel a finding that a trust was formed to operate a business, although not every trust holding stock was created to conduct business.  Id. at *10.

Other jurisdictions do not follow either test per se, but rather apply a list of factors, which differ from court to court.  The Eastern District of Virginia considers eight factors: (1) whether the trust instrument's language indicates that the trust was intended to be a business trust; (2) whether the trust was created to transact business for the benefit of investors; (3) whether the beneficiaries have significant management and control of the trust and whether the trustee-beneficiary relationship resembles that of agent-principal; (4) whether there is any evidence of any attempt to comply with the state law recording requirements for business trusts; (5) whether the trust had any employees or business office; (6) whether the initial funding of the trust was by a conveyance of real property or

by a pooling of assets by investors or beneficiaries or by selling shares; (7) whether the trust was created for the purpose of winding up the affairs of a predecessor business; and (8) whether the trust appears to be a land trust. Williams v. Equity Holding Corp., 498 F. Supp. 2d 831, 846 (E.D. Va. 2007). The District of Arizona considers whether the trust is actively engaged in business and whether the trust has significant attributes of a corporation, and also deems whether a trust has qualified under state law to be a business trust an important factor. In re Hankins, No. 06-02112, 2006 Bankr. LEXIS 2923, at *8-9 (Bankr. D. Ariz. Oct. 24, 2006). The District of Nebraska and the Western District of Louisiana both consider (1) whether the trust was created and maintained for a business purpose; (2) whether the trustee holds title to the trust res; (3) whether there is centralized management; (4) whether continuity of the trust is interrupted by the death of a beneficial owner; (5) whether there are transferable certificates of ownership; and (6) whether there is limited liability. In re Frank & Huck Trading Co., No. BK01-41308, 2001 Bankr. LEXIS 2144 (Bankr. D. Neb. Aug. 6, 2001), In re Hemex Liquidation Trust, 129 B.R. 91, 97 (Bankr. W.D. La. 1991). Finally, the District of Massachusetts found that a business trust did not exist because the beneficiaries did not contribute capital to the trust, the beneficiaries were related by blood to the trustees, and the shares of the trust where not transferable nor represented by certificates. In re L & V Realty Trust, 61 B.R. 423, 425 (D. Mass. 1986).

      The Court need not dwell for long upon the precise standard to apply from these various cases. Under any standard, the MBT is not a business trust and is not eligible for bankruptcy relief for the following reasons:

- The MBT was created for estate planning and for marriage planning purposes. This fact was established by the evidence and admitted by Alan Nash.

- The primary purpose of the MBT is, as set forth in the MBT Agreement, "to hold certain property, and to provide for the maintenance, care comfort and support of [Thomas Nash] and [his] beneficiaries . . ."  MBT Agreement at 1. In light of his upcoming marriage, Thomas Nash also wanted to be sure that the assets in the MBT would not be considered marital assets.

- The MBT Agreement is a standard trust agreement that contains ordinary and usual provisions that are found in estate-planning trusts.  This fact was established by the testimony of Gary Altman, who was qualified as an expert in the field of estate planning and testamentary trusts.

- There was no pooling of assets in creating the MBT.  Thomas Nash solely contributed his assets to the MBT, and there was no evidence that any other party ever invested in or contributed to the MBT.

- The amount of the distribution to be received by any beneficiary from the MBT is strictly based on Thomas Nash's intent as set forth in his will or the Thomas K. Nash Family Trust, which also was created by Thomas Nash; no beneficiary will receive a distribution based on any return or recovery from their investment or as a result of their efforts to make the MBT more valuable.

- The beneficiaries cannot vote or otherwise exercise any control or formal influence over the MBT.  The beneficiaries do not have authority to dictate how the trust should be run.  Not only was this fact established by the terms of the MBT Agreement, it also how the MBT has been administered as a matter of fact.

For example, when Caroline Nash attempted to prevent Alan Nash from making the Bon Secours swap, he ignored her view and consummated the swap. See supra, Findings of Fact, Section D.

- No beneficiary has any right or authority to transfer his or her interest in the MBT.

- No creditor of a beneficiary can reach any beneficiary's interest (other than creditors of Thomas Nash, when he was alive) by garnishment or otherwise.

- The MBT has a finite duration. Upon Thomas Nash's death, the primary function of the trustee of the MBT was to pay any taxes and expenses and then pay over the balance of the trust estate in accordance with Thomas Nash's wishes as set forth in the Thomas K. Nash Family Trust, or in the absence of such a document, in the will of Thomas Nash. MBT Agreement at Article Fourth and Fifth, as amended. The only reason the MBT remains in existence this long after Thomas Nash's death is due to the alleged dispute over the distribution to the Movant, on behalf of Caroline Nash, and the payment to Martha Nash.

- The MBT is not a business trust under Maryland state law or any other state law, and was not intended to be a business trust under state law. Alan Nash admitted he received substantial advice from attorneys and accountants and no one ever told him the MBT was a business trust under state law. Alan Nash never made, or was told or asked to make, any filings with the Maryland State Department of Assessment and Taxation or any other state agency that would suggest the MBT was a business trust under state law. See MD. CODE ANN., CORPS. & ASS'NS §12-203(a)("a Maryland business trust shall have . . . a principal office in this State"

15

and "at least one resident agent") and §12-205(d)("a certificate of trust on file with the office of the Department [of Assessments and Taxation] is notice that the entity formed in connection with the filing is a business trust").

Despite the foregoing overwhelming indicia that the MBT is an estate and marital planning trust and not a business trust, Alan Nash argues that the MBT is a business trust because (1) the MBT "conducts business" and operates "as a business;" (2) its participation in the AMA evidences the pooling of interests that a number of courts consider to be an important indicator of a business trust; and (3) notwithstanding Article Fifth, the MBT is of indefinite duration because the enumerated trustee powers include the authority to hold assets "indefinitely." The Court will address each in turn.

Alan Nash's contention that the MBT is run "as a business" and "conducts business" is overstated and unpersuasive. First, in terms of governance, the MBT is managed nothing like a business. There is no board of directors or other governing body that directs the affairs of the MBT. The beneficiaries have no say in its administration. The MBT is administered unilaterally by Alan Nash, and nothing in the record suggests he is a beneficiary of the MBT or has any financial stake in it. Thus the MBT is administered unilaterally by one person who has no stake in it, and the persons or entities that hold all of the interests in it have no say in its management. This is not how a corporation, partnership, limited liability company or sole proprietorship is run.

Moreover, since Thomas Nash's death, the extent to which Alan Nash has been "conducting business" has been exaggerated. Alan Nash has been winding down the investments in the MBT and has not acquired any notes or real estate, other than swapping Locus Grove for Bon Secours. Moreover, collecting or foreclosing on the deed

of trust notes, collecting rents from real estate investments, repairing and maintaining real estate and selling real estate does not make the MBT a business trust.  Considering the asset composition of the MBT, these activities are entirely consistent with the duty to protect and preserve the trust res for the beneficiaries, and are consistent with the powers given to the trustee under the MBT Agreement.  To be sure, Alan Nash submitted evidence that he has been pursuing the development of a parcel of land on Blair Road.  But engaging in business activities alone does not make a trust a business trust.  <u>See</u> <u>supra</u> <u>Secured Equipment</u> at 89 (engaging in business-like activities, without more, does not prove that a trust is a business trust).

Alan Nash also contends that the MBT's participation in the AMA arrangement reflects the pooling of assets that many courts consider one of the important indicia of a business trust.  This Court disagrees.

The AMA is essentially a cash management system for the participating entities.  <u>See</u> Findings of Fact, Section D.  It was created by Thomas Nash's accountant because each entity (including the MBT) had a separate checking account and the management of receipts and disbursements of all of Thomas Nash's entities and trusts was cumbersome and inefficient.  The system provides greater control over cash and accounting through the use of one receipt-and-disbursement account, and the corresponding ledger entries for each transaction.  But the AMA is not reflective of a "pooling of assets" *within the MBT* by any means. With respect to the MBT, the entities who participate in the AMA and who hold the "due from" as the offset to MBT's "due to" are simply creditors of MBT, not investors.  This point was not disputed by Alan Nash.

17

Finally, Alan Nash contends that the MBT has an indefinite duration because Article Sixteenth, which enumerates the trustee's powers, authorizes the trustee to "retain indefinitely" the trust assets. To the contrary, Gary Altman testified that Article Sixteenth contained an ordinary and usual list of trustee's powers, and in his opinion, no court would conclude that the simple statement that the trustee could retain assets indefinitely would not override the express provision of Article Fifth, requiring the trustee to distribute all of the trust estate upon Thomas Nash's death. Further, the parties stipulated that the enumeration of powers in Article Sixteenth is the same as the enumeration of powers in the seven other trusts established by Thomas Nash. Finally, the general rule in the construction of trusts is to determine the intention of the trust settlor. See McCrory Stores Corp. v. Bennett, 152 A. 258, 261 (Md. 1930)(the language used in creating the trust will be applied in accordance with the purposes of its creation). Here, it simply cannot be said that the passing reference to the trustee's power to hold assets "indefinitely" could override the unambiguous intention of Thomas Nash that the balance of the trust estate should be distributed upon his death to the Thomas K. Nash Family Trust, or in accordance with his will, as the case may be. See MBT Agreement at Article Fifth, as amended.

## III. CONCLUSION

For the foregoing reasons, the Court finds and concludes that the MBT is not a business trust, and thus is not eligible to seek bankruptcy relief under Section 109(d) of the Bankruptcy Code. The Court will enter an order dismissing the case.

cc:

Mortgage Banking Trust
9914 Mayfield Drive
Bethesda, MD 20817

William Paleos, Esq.
242 Carroll Parkway
P.O. Box 161
Frederick, MD 21705

Craig Brodsky, Esq.
One South Street, 20th Floor
Baltimore, MD 21202

Caroline Nash
Co-Trustee of the Nash Marital Trust
21402 Unison Road
Middleburg, VA 20117

**END OF MEMORANDUM**